## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No.  1:22-cv-00430-NYW

DENNIS J. DUPRAY, as Beneficial Owner and
Managing Partner of  TRACBEAM, LLC  and
TRACBEAM, LLC a Colorado Limited Liability
Company,

       Plaintiffs,

v.

OXFORD INSURANCE COMPANY TN LLC, a
Tennessee Limited Liability Company and
SERIES PROTECTED CELL 1, a series entity of
OXFORD INSURANCE COMPANY TN LLC,

       Defendants.

_____

## AMENDED COMPLAINT AND JURY DEMAND

---

## <u>COMPLAINT</u>

      Plaintiffs, Dennis J. Dupray, and TracBeam, LLC, by and through their attorneys of

record, Thomas D. Neville of Ogborn Mihm LLP and John Michael Johnston, assert this

Amended Complaint against Defendants Oxford Insurance Company TN LLC and Series

Protected Cell 1 of Oxford Insurance Company TN LLC.  Plaintiffs allege and state as follows:

### <u>INTRODUCTION</u>

      1.     This is a breach of contract and insurance bad faith action arising from

Defendants' wrongful denial of Plaintiffs' claim for benefits under an "Actual Net Loss Policy"

("**ANLI**") of captive insurance policy number 43-18 (hereinafter the "**Policy**," "**ANLI Policy**" or "**Oxford Policy**").

2.      Plaintiff Dennis J. Dupray is an inventor. Since the late 1990s, Dr. Dupray has invented more than 25 telecommunication products, systems and/or methods that are based upon the core concepts of (a) determining more reliable and accurate locations of a user's cell phone through the use of wireless signals from cell phone towers, global navigation satellite systems (e.g., GPS), Wi-Fi networks, etc., and (b) applications for using such enhanced cell phone locations. Dr. Dupray assigned many of these inventions to his company, TracBeam, LLC ("**TracBeam**"), which obtained patents from the U.S. Patent and Trademark Office for the inventions.

3.      After becoming aware that TracBeam's patents were being exploited by some of the largest technology companies in the world, in 2010, Dr. Dupray retained Dovel & Luner ("D&L") to help TracBeam enforce its patent rights.

4.      D&L has been one of the most successful intellectual property litigation firms in the United States.

5.      In in late 2010, TracBeam began enforcing its patents via patent infringement litigation against infringing companies.

6.      Between 2011 and 2018, D&L litigated (and settled) TracBeam patent infringement cases against twelve companies in the time period 2010 through 2018.[1]

---

[1] For fundamental patents in wireless location technology, *e.g.* for implementing wireless navigation, geo-fencing, friends and family tracking, and emergency services.

7.    TracBeam's lawsuits were very successful, resulting in average net revenues of over two million dollars ($2,000,000) annually.

8.    However, in the later settled infringement cases, D&L had to contend with multiple occurrences of an additional proceeding at the U.S. Patent and Trademark Office ("**USPTO**") known as an "inter partes review" ("**IPR**").[2]

9.    An IPR allows defendants in a patent infringement case to administratively challenge the validity of patent(s) being asserted.

10.    The IPR process created an entirely separate trial procedure within the USPTO.

11.    Pursuant to TracBeam's fee agreement with D&L, the cost of defending IPRs was born/advanced by D&L.  These costs were in addition to the normal—and quite substantial—costs of patent infringement litigation,[3] which D&L also advanced.

12.    Sensitive to the changing nature of the patent infringement litigation landscape, in 2014, Dr. Dupray sought out a captive insurance policy to obtain a measure of protection in the event that changes to venue rules and the newly created IPR process made further patent infringement litigation less profitable.

13.    Dr. Dupray worked with Defendants, their associated entities, and consultants selected by Defendants to design an insurance policy to meet Plaintiffs' needs.

14.    Dr. Dupray specifically identified the loss of D&L's services as a result of IPRs and potential changes to venue rules as risks for which Plaintiffs sought coverage.

---

[2] **IPRs** were created as part of the America Invents Act (the "**AIA**"), which went into effect on March 16, 2013.  In the AIA, Congress created a procedure to allow the USPTO to assess the validity of any patent independently from any court infringement proceeding.

[3] Typically, each such infringement action took over 2 years of legal effort independently of IPR filings at the USPTO.

15.     Plaintiffs eventually purchased an Actual Net Loss policy of insurance from Defendants.  That policy (and its renewed policies) provided coverage in the event that Plaintiffs' "Key Supplier" terminated its contract with Plaintiffs as:

> a result of: . . . the *adoption or promulgation of federal, state or local laws, regulations or ordinances, by any legislative body, executive authority or agency* affecting such **Key Supplier's** business and resulting in increased costs or operating expenses, reduction in the **Key Supplier's** business production capacity, or the **Key Supplier's** withdrawal of a product or service from the market."

(Emphasis added).

16.     By 2017, the cost for fully defending an IPR had skyrocketed, according to various estimates, to approximately $500,000 per IPR.

17.     In the later years of D&L's representation of TracBeam, D&L had to address 28 IPR filings against TracBeam patents.

18.     In addition, in 2017, the United States Supreme Court announced its opinion in *TC Heartland LLC v. Kraft Foods Group Brands, LLC*, 581 U.S.___, 137 S. Ct. 1514, 197 L. Ed 816, U.S.P.Q.2d 1553 (2017), changing venue rules which tilted venue toward courts more favorable to patent infringers, e.g., toward courts having headquarters of large telecommunication companies in their districts.

19.     In 2019, D&L terminated its relationship with Plaintiffs, and specifically cited increased costs resulting from the IPR process, as well as recent venue changes, as the bases for terminating.

20.     Plaintiffs submitted a claim for benefits under the Policy, only to have Defendants deny it, in late 2019, out of the apparently mistaken belief that the IPR process and new venue rules were not the result of the promulgation of federal law.

21.     Dr. Dupray and TracBeam responded to this denial with a letter providing additional explanation of why coverage should exist for the loss of D&L's services and pointing out that the IPR process was the result of the promulgation of a federal law.

22.     On March 26, 2020, Defendants replied and unreasonably denied Plaintiffs' request for benefits.

23.     Plaintiffs now bring this action to obtain the benefits for which they have contracted and any other remedies available to them.

### NATURE OF ACTION

24.     This action seeks money damages resulting from Defendants' unjustified denial of an insurance claim (Claim # 2019-TN-026) regarding "Loss of a Key Supplier" for TracBeam, LLC.  As detailed below, Plaintiffs submitted said claim pursuant to the Policy, which the Plaintiffs purchased through Oxford Insurance Company TN LLC and Series Protected Cell 1 of Oxford Insurance Company TN LLC for policy year 2018-2019.

### PARTIES

25.     Plaintiff Dennis J. Dupray, is now (and was during all of the events pertinent to this Cause of Action) a resident and citizen of the State of Colorado.  Dr. Dupray is the sole manager and member of TracBeam, LLC.  Plaintiff TracBeam, LLC is a Limited Liability Company organized under the laws of the State of Colorado and a citizen thereof. The formal address for both Plaintiffs is 1801 Belvedere Drive, Golden, Colorado 80401.

26.     Defendant Oxford Insurance Company TN LLC ("**Oxford Insurance Co.**"), is a series limited liability company, organized under the laws of the State of Tennessee and licensed on November 22, 2013 as a protected cell captive insurance company.  Oxford Insurance Co. adopted its "Amended Operating Agreement" on December 3, 2013. Oxford Insurance Co. maintains its principal place of business at One Nashville Place, 150 Fourth Avenue, Suite 1100, Nashville, Tennessee 37219, and is not an admitted insurer in the State of Colorado.

27.     Defendant Oxford Insurance Co. has two members, 2013 Ventures, LLC and Assateague Ventures, LLC.

28.     The sole member of 2013 Ventures, LLC is Michael A. DiMayo.  Mr. DiMayo's place of domicile is in Monkton, Maryland.

29.     The sole member of Assateague Ventures, LLC is Kevin E. Myers.  Mr. Myers' place of domicile is in Berlin, Maryland.

30.     Therefore, Oxford Insurance Co., though organized under Tennessee law, and headquartered in Tennessee, is a citizen of Maryland.

31.     Defendant Series Protected Cell 1 of Oxford Insurance Co. ("**Series Protected Cell 1**") is a series of Oxford Insurance Co.  Series Protected Cell 1 maintains its principal place of business at One Nashville Place, 150 Fourth Avenue, Suite 1100, Nashville, Tennessee 37219. Series Protected Cell 1 is not an admitted insurer in the State of Colorado.

32.     Defendant Series Protected Cell 1 is a series of Oxford Insurance Co.  It is not a separate entity, and an individual's membership in a series of Oxford Insurance Co. conveys no membership interest in Oxford Insurance Co.  Consequently, Series Protected Cell 1 shares its membership with Oxford Insurance Co., and is a citizen of Maryland.

6

33.     Oxford Insurance Co. and Series Protected Cell 1 are collectively referred to in this Complaint as "**Defendants**."

## JURISDICTION AND VENUE

34.     This Court has jurisdiction pursuant to 28 U.S.C. § 1332(a) because there is a diversity of citizenship between the parties to this action and the amount in controversy exceeds $75,000, exclusive of interest and costs. *See also* ¶¶ 36-38 below.

35.     Venue is proper in this jurisdiction despite a forum selection clause provision in the Policy.  In particular, page 31, *§ VII*. "Dispute Resolution," ¶ B ("**Forum**")[4] of the Policy recites that "Any suit or action to enforce this Policy or any rights granted pursuant to this Policy may be brought only in courts located within the State of Tennessee."

36.     Venue and Jurisdiction are nonetheless proper in this Court because the Colorado Supreme Court has expressly held that a forum selection clause in a private contract cannot divest a [Colorado] Court of either personal or subject matter jurisdiction and, as a result, a forum selection clause will not be enforced if the underlying contract is against [Colorado] public policy. The Colorado Supreme Court has also emphasized that there is a "common law principle" which holds that "the lawful jurisdiction of courts cannot be ousted by the private agreements of individuals."

37.     In §10-3-1002, Colo. Rev. Stat., Colorado's General Assembly declared:

> [I]t is a *subject of concern* that many residents of this state hold policies of insurance issued or delivered in this state by *insurers* while *not authorized to do business* in this state, thus *presenting* to such residents the often *insuperable obstacle of resorting to distant forums* for the purpose of asserting legal rights under such

---

[4] Bold and underlining in original.

> policies . . . [and, consequently, Part 10 of the Colorado Revised Statutes properly] exercises powers and privileges available to the state by virtue of Public Law 15, 79th Congress of the United States, Chapter 20, 1st Sess., as amended, which declared that the business of insurance and every person engaged therein shall be subject to the laws of the several states.

(Emphasis added).

38.     Since neither Defendant is authorized to engage in the business of insurance in Colorado, Defendants violated Colorado law and public policy by:

   (a)   Failing to comply with the initial Colorado licensing requirements for selling Insurance Policies to Colorado residents, as set forth in §10-6-107, Colo. Rev. Stat. (2018);

   (b)   Failing to provide an adequate and mandatory disclosure statement to the insured(s) as required by §10-4-419, Colo. Rev. Stat. (2018), which should have explained and distinguished Plaintiff's "claims made policy" from an "occurrence policy;"[5] and

   (c)   Failing to file a certification of compliance with the Colorado Commissioner of Insurance documenting proper compliance with the "claims made" policy notification requirements that are mandated by §10-4-419, Colo. Rev. Stat. (2018).

## **FACTUAL ALLEGATIONS**

### *A.     Policy Formation.*

---

[5]  Indeed, the only "notice" in regard to this subject came on the very first page of the Oxford Policy itself, in the second sentence of the text, when the policy merely recited without elaboration: "This is a claims made policy."

39.     Defendants are supervised, advised, and assisted by an entity named "Oxford Risk Management Group" ("**Risk Management Group**") which is a provider of Captive Insurance Services. Risk Management Group is a Delaware LLC, and its headquarters is located at 954 Ridge Brook Rd. Suite 100 in Sparks, Maryland.

40.     At all relevant times, Michael DiMayo and Kevin Myers, were both the President and Vice President of Oxford Insurance Co., respectively, and the co-founders and principals of Risk Management Group.

41.     Although Defendants engaged in the business of insurance in Colorado, neither Defendant is authorized by the Colorado Division of Insurance to issue any insurance policy to residents of Colorado.

42.     During the latter part of 2014, Dr. Dupray decided to participate in the Oxford Captive Insurance Program ("**Oxford Insurance Program**"), as publicly advertised and promoted by Risk Management Group.  Dr. Dupray contacted Risk Management Group via email and eventually by phone. Representatives of Risk Management Group stated that the benefits of the Oxford Captive Insurance Program, were (among other things) to:

   (a)    provide coverage(s) for enterprise risks of the participants in the Oxford Insurance Program (*i.e.*, Dr. Dennis Dupray and TracBeam, LLC) which coverage(s) are not available through, or not affordable from, the standard commercial insurance market; and

   (b)    obtain better control over the claims process (for any claims that the insureds might later assert).

43.     After making contact with Risk Management Group, its representatives quickly provided Dr. Dupray with a "Business Intake Form" which Risk Management Group prepared for TracBeam to fill out. On the Business Intake Form TracBeam described itself as a "patent holding company." The Business Intake Form also reflected that Dr. Dupray was the "Managing Partner" of TracBeam. The Business Intake Form correctly identified TracBeam's mailing address as 1801 Belvedere St. Golden, Colorado 80401.

44.     In preparation for enrolling TracBeam as an insured in the Oxford Captive Insurance Program, Risk Management Group undertook an activity that it described as "underwriting." Risk Management Group supposedly conducted this "underwriting" to decide which coverages the Plaintiffs needed and which coverages that Risk Management Group would agree to write for Plaintiffs. Upon information and belief, Risk Management Group's internal "underwriting" was mostly performed by un-credentialed, in-house staff and was not consistent with the underwriting done by standard commercial insurers. Risk Management Group arranged a supposedly independent review of TracBeam's exposure to various risks (resulting in a document referred to herein as the "**Risk Review**") using a "risk analysis" entity known as "Risk International Services, Inc." ("**Risk International**").

45.     To assist Risk International in preparing the Risk Review, Dr. Dupray provided itemizations and descriptions of the risks TracBeam faced and for which it sought coverage.[6]

46.     During preparation of the Risk Review, Risk International studied information that Plaintiffs prepared and provided regarding TracBeam's risks.  Risk International then (i)

---

[6] Upon information and belief, such risks were not available for coverage by standard commercial insurance available to TracBeam.

addressed Plaintiffs' need for obtaining various Oxford Insurance Program coverages, and (ii) identified certain risk exposures Defendants would assume if they provided those coverages.

47. Risk International sent the Risk Review to Risk Management Group. Consequently, Risk Management Group was on notice of its contents.

48. While the Risk Review purports to be dated October 10, 2014, Risk Management Group emailed the final version of it to Dr. Dupray on December 9, 2014.

49. As is pertinent here, the Risk Review identified the risk that TracBeam's relationship with its patent litigation counsel, D&L, might end because of the impact of certain court cases and legislation.

50. In the portion of the Risk Review addressing "Loss of Key Supplier" coverage, Risk International stated that its task was "to evaluate the application of this cover[age] to insure against the loss of the team of lawyers that handles most of the TracBeam's litigation matters."

51. Regarding requested coverage for Loss of Key Supplier, TracBeam *only* requested coverage for loss of its retained patent litigation attorneys/law firms, and in particular only requested coverage for loss of services of D&L, the law firm that (as the Risk Review states):

> does all the litigation contributing to virtually 100% of the income to TracBeam. Accordingly, TracBeam's income is primarily dependent upon the performance of its attorneys . . . (a) TracBeam has been working with this litigation law firm since 2010[,] (b) Cost and Time to Replace: Difficult; extremely difficult to find competent patent litigation attorneys, particularly, retained on a contingency fee basis.

52.     As of December 9, 2014, Defendants were on notice that current and impending "court rulings" regarding "venue" for patent infringement cases might result in damages to Plaintiffs.

53.     By December 9, 2014, Defendants were on notice that the IPR process might result in damages to Plaintiffs.

54.     Defendants also knew that Plaintiffs sought to insure against damages arising from the IPR process and the impact of federal court venue law changes.

55.     Indeed, under the heading "Exposures and Concerns Identified by TracBeam . . .," the final draft of the Risk Review states:

> 1. TracBeam incurs the following risks from the U.S. Federal Courts . . .
> > b. Desired *venue* [for TracBeam assertion of its patents] is *more difficult* to obtain in patent infringement actions *due to recent court rulings and new patent laws that went into effect about 3 years ago and are now fully in effect.*
> > c. The patents could be ruled invalid for various reasons by the courts . . .
> 2. TracBeam incurs the following risks from the United States Patent and Trademark Office (USPTO) . . .
> > b. Issued patents are *subject reconsideration by the USPTO* wherein the patents can be invalidated and/or result in restricted patent protection.
> As indicated above, new patent laws went into effect about 3 years ago and are now fully in effect. *One piece of such new legislation allows a patent infringement defendant to file with the US Patent Office to invalidate patents asserted against the defendant in an Inter Partes Reexamination (IPR).* This can be [a] difficult and time consuming . . . procedure for TracBeam and costs can be in the range of approximately $100k per patent or more. According to statistics on the outcomes of such IPRs, it is almost a guarantee that some patent protection is likely to be lost . . . .

(Emphasis added).

56.     Additionally, in the Risk Review's analysis of Loss of Key Supplier, Risk

International stated:

> **Loss of Key Supplier** . . .  are coverages that typically pertain to the
> disruption of the inflow of materials a company needs to produce their
> goods. TracBeam . . . [does] not really have a supply chain, per se. The
> task [Risk International]   is presented with here is to evaluate the
> application of this cover to insure against the loss of the team of lawyers
> that handles most of the TracBeam's litigation matters. As noted,
> TracBeam's income is solely dependent upon their performance.
> Inasmuch as the TracBeam is concerned it would be very difficult to
> find quality attorneys who have the expertise that TracBeam needs, *this
> is an important exposure to TracBeam. The challenge is whether the
> firm the TracBeam hires to represent them can be considered a supplier.
> Care should be given to understand the specific losses that **Loss of Key
> Supplier** . . . coverage may insure against.*

(Emphasis added, bold in the original).

57.     Another entity assisting Risk Management Group was "Oxford Research Group,

LLC" which commissioned a written actuarial study ("**Actuarial Study**") from By the Numbers

Actuarial Consulting, Inc. ("**By the Numbers**"). The Actuarial Study is dated January 20, 2015.

In the Actuarial Study, By the Numbers focused on each potential coverage Plaintiffs sought,

including "Loss of Key Supplier" coverage. In particular, regarding Loss of Key Supplier, the

Actuarial Study expressly noted that TracBeam was being provided coverage with:

> [P]rotection against the wrongful termination or cancellation by a
> key supplier of any contract between TracBeam . . . and such key
> supplier.  It also provides TracBeam . . . with protection against the
> termination   or   cancellation   of   any   contract   between
> TracBeam . . . and a key supplier as a result of the interruption to or
> cessation, suspension, or diminution of the business of such key
> supplier caused by . . . *the adoption, promulgation*, or enforcement
> *of federal, state, or local laws, regulations, or ordinances, by any
> legislative body, executive authority or agency, affecting* such key
> supplier's business and resulting in increased costs or operating
> expenses, reduction in the key supplier's business production

> capacity, or the key supplier's withdrawal of a product or service
> from the market.

(Emphasis added).

58.     By the Numbers then calculated a premium for Defendants to charge Plaintiffs for providing "Loss of Key Supplier" coverage, i.e., $119,767 for each of the first two years of "Loss of Key Supplier" coverage (2014-2015 and 2015-2016 policy years).

59.     Based on at least the information contained in the Risk Review and the Actuarial Study, Series Protected Cell 1 purportedly agreed to act as a "fronting company" for Oxford Insurance Co. and issued an initial captive insurance policy ("**Initial Policy**") — as a "claims-made Actual Net Loss Insurance Policy" to TracBeam, LLC (the named insured), with an "effective date" of December 31, 2014.

60.     The Initial Policy contained a number of stated coverages, including a coverage of $1,000,000 for "Loss of Key Supplier," the highest limit offered by Defendants.

61.     As used in the insurance industry, "fronting"[7] refers to the practice of using a licensed, admitted insurer to issue an insurance policy on behalf of an entity that cannot write an insurance policy because it (the unlicensed or non-admitted entity) lacks legal authority to do so.

62.     Delivering/issuing an insurance policy to a Colorado resident constitutes transacting insurance business in Colorado as defined in Colorado Revised Statutes §10-3-903(1)(e).

63.     Neither of the Defendants have ever obtained a certificate of authority to transact insurance business in the State of Colorado.

---

[7] As in "fronting company" in the paragraph immediately above.

64.     Consequently, SPC-1 could not act as a fronting company for Oxford Insurance

Co. in the traditional sense.

65.     Accordingly, Defendants engaged in the unauthorized business of insurance when

they issued the Initial Policy to Plaintiffs in Colorado.

66.     The Initial Policy's Loss of Key Supplier coverage states, in pertinent part, that it

would cover losses resulting from:

> the termination or cancellation of any contract between Insured and
> a Key Supplier as a result of the interruption to or cessation,
> suspension or diminution of the business of such Key Supplier
> caused by: . . . *the adoption, promulgation, or enforcement of*
> *federal, state or local laws, regulations or ordinances, by any*
> *legislative body, executive authority or agency affecting* such Key
> Supplier's *business and resulting in increased costs or operating*
> *expenses, reduction in the* Key Supplier's business *production*
> *capacity, or the* Key Supplier's *withdrawal of a product or service*
> *from the market.*

(Emphasis added).

67.     Similarly, the Initial Policy's "Legislative and Regulatory Changes" coverage

states, in pertinent part, that it would cover losses resulting from:

> *the adoption, promulgation or enforcement of federal, state or local*
> *laws, regulations or ordinances, by any legislative body, executive*
> *authority or agency, affecting* an Insured's *business and resulting in*
> *increased costs or operating expenses, reduction in the* Insured's
> *production capacity, or the* Insured's *withdrawal of a product or*
> *service from the market* . . . .

(Emphasis added)

68.     Since Defendants offered TracBeam the coverages described in the Initial Policy

with full knowledge that TracBeam sought to insure the risks identified in the Risk Review and

the Actuarial Study,[8] Defendants consented to providing, e.g., "Legislative and Regulatory Changes" coverage for "*recent court rulings and new patent laws that went into effect about 3 years ago and are now fully in effect*" (Emphasis added) as stated in Defendants' Risk Review report of December 9, 2014.

**B.      *Defendants Renew the Policy and Collect Premiums for Loss of a Key Supplier Coverage for Four Years.***

69.     The Initial Policy for TracBeam has been renewed and re-issued annually, including the Policy implicated in this lawsuit.

70.     However, upon information and belief, *neither* the original Risk Review (by Risk International), *nor* the original Actuarial Study were reviewed by, or updated for, the Defendants in any of the subsequent re-issued policy years.

71.     No such update/review was communicated to Plaintiffs.

72.     Between 2014 and 2018, Defendants changed the language of the Loss of Key Supplier coverage.

73.     Upon information and belief, no further third-party risk exposure analysis of any kind was performed in any subsequent years of TracBeam's policy renewals.

74.     For the 2016 policy year, when Dr. Dupray queried Risk Management Group (on December 11, 2015) regarding a subsequent risk analysis review comparable to the Risk Review, Paul Francisco, then-Director of Client Services for Risk Management Group, replied: "If you would like to engage them to do another exposure review, we can get you an engagement

---

[8]  And which TracBeam selected for coverage in every policy year it was offered.

letter.  The cost is still only $7,500.  *Almost all of our clients have an exposure review done in year one, but no one to date has requested an update after only one year . . .*" (Emphasis added).

75.     Accordingly, TracBeam did not commission any further risk analysis for coverages offered to TracBeam, and upon information and belief, neither did Risk Management Group.

76.     Further, on Defendants' annual underwriting form, for at least policy renewal years 2017-2018 and the Policy year 2018-2019, TracBeam stated, as the basis for Loss of Key Supplier coverage, ". . . there is one law firm [D&L] that has primary responsibility for the patent infringement litigations and licensing efforts contributing to virtually all of the income to TracBeam. TracBeam's income is substantially dependent upon the performance of its attorneys."

77.     For the Policy (2018-2019 policy year), Defendants charged the Plaintiffs a premium of $73,463 for "Loss of Key Supplier" coverage.

78.     Despite Defendants' knowledge obtained from the Risk Review and the Actuarial Study, at no time prior to, or during, the Initial Policy or any subsequent policy (including the Policy) period, did Defendants or any related entities inform Plaintiffs that D&L would not be considered a Key Supplier.

79.     Despite Defendants' knowledge obtained from the Risk Review and the Actuarial Study, at no time prior to, or during, the Initial Policy or any subsequent policy (including the Policy) period, did Defendants or any related entities inform Plaintiffs that the loss of D&L's services would not be covered under Loss of Key Supplier coverage.

80.    Despite Defendants' knowledge obtained from the Risk Review and the Actuarial Study, at no time prior to, or during, the Initial Policy or any subsequent policy (including the Policy) period, did Defendants or any related entities inform Plaintiffs that venue related changes or the effects from the implementation of IPRs, as Plaintiffs identified in the Risk Review, would not be covered under issued policies.

81.    Defendants wrote "Loss of Key Supplier" coverage for TracBeam (and collected premiums therefor) annually from the beginning of 2015 through mid-2018, including for the Policy.

82.    Moreover, in no policy year prior to the filing of Plaintiff's claim for Loss of Key Supplier under the Policy did Defendants' internal "underwriting" process reject TracBeam's request to obtain coverage for "Loss of a Key Supplier" for D&L.

83.    In no policy year did Defendants insert any exclusion into the Policy in order to avoid providing coverage for injuries to TracBeam that might arise due to (a) federal venue change actions constituting legislation, or (b) the implementation and extreme use of IPRs by patent infringement defendants.

**C.      The Instant Policy.**

84.    In early 2018, Defendants issued the Policy, with an effective date of May 4, 2018.

85.    The Policy defines a Key Supplier as:

> A third party who provides services or delivers goods to Insured, or who provides goods or services brokered by Insured which third party:
>     1. represents 10% or more of the annual value of merchandise, supplies, parts, materials and services purchased or brokered by

18

> Insured and is reported to Company [defined as "Series Protected Cell 1, a Series of Oxford Insurance Company TN LLC" in the policy] during the underwriting of this Policy; or 2. is specified on a schedule to this Policy.

86.     D&L provided services to Plaintiffs in the Policy year.

87.     D&L is specified on a schedule to The Policy.

88.     The Policy's definition of a "Loss of Key Supplier" event includes the following trigger:

> [T]he termination or cancellation of any contract between Insured and a Key Supplier as a result of: . . . the *adoption or promulgation of federal, state or local laws, regulations or ordinances, by any legislative body, executive authority or agency* affecting such **Key Supplier's** *business and resulting in increased costs or operating expenses, reduction in the* **Key Supplier's** business *production capacity, or the* **Key Supplier's** *withdrawal of a product or service from the market.*

(Emphasis added; bold text in the original).

89.     The Policy defines a "Legislative and Regulatory Changes" event as: *. . . the adoption or promulgation of federal, state or local laws, regulations or ordinances . . . by any legislative body, executive authority or agency, affecting* an Insured's *business and resulting in increased costs or operating expenses, reduction in the* Insured's *production capacity, or the* Insured's *withdrawal of a product or service from the market.*

(Emphasis added).

90.     The italicized text in the above event criteria for the Policy's "Loss of Key Supplier" and "Legislative and Regulatory Changes" is: (a) identical, (b) identical to the Initial Policy's "Legislative and Regulatory Changes" (*cf.*, ¶ 66 italics), and (c) was *only* clarified as to coverage in the Risk Review and the Actuarial Study (*cf.*, ¶¶ 56, 57).

91.     In the final Risk Review, used by Defendants to determine the risk exposure

coverages to be assumed, Risk International observed that:

> . . . Administrative Actions, Judicial Delay, and *Legislative and Regulatory Changes* are all exposures to TracBeam . . . . *Given the evolving regulatory environment regarding patents and patent infringement, these are legitimate risks to net income. In our opinion, these are exposures that can be insured in a captive insurance program.*

(Emphasis added).

92.     The risk of losses to net income arising from an "evolving regulatory environment

regarding patents and patent infringement" was specifically contemplated by Plaintiffs and

Defendants when the policy was initiated and renewed each year thereafter.

93.     Defendants agreed to accept the risk of these losses when they issued the Policy to

Plaintiffs and collected premiums for coverages that purported to cover such risks.

94.     Defendants have never communicated to Plaintiffs what would constitute a Loss

of Key Supplier beyond what is contained in the Policy.

**D.      *TracBeam Loses its Key Supplier.***

95.     In the first quarter of 2019, D&L notified Dr. Dupray that D&L was terminating

the legal services they had been providing to TracBeam pursuant to a contingency fee contract

with TracBeam ("**Fee Agreement**").  D&L indicated it was terminating its relationship with

TracBeam due to:

(a)   The "costs and risks[9] associated with" (i) "likely IPR filings at the PTAB [Patent Trial and Appeal Board at the USPTO]" resulting from TracBeam patent litigation filings, and (ii) "motion practice under the recent line of Section 101 cases from the Federal Circuit and various district courts," and

(b)   A recent (2017) Federal Supreme Court decision (*TC Heartland LLC v. Kraft Foods Group Brands, LLC*) increasing "the difficulty in bringing suit against one or multiple infringers in a suitable venue . . ."

**E.      *TracBeam Makes a Claim for Loss of Key Supplier.***

96.    Consequently, in early April 2019, Plaintiffs verbally reported a loss arising from D&L's termination of legal services to TracBeam under the "Loss of Key Supplier" provision in the Policy.  On April 8, 2019, Dr. Dupray received a responsive email from Lindsey Shue, an executive assistant with Risk Management Group, advising him that Plaintiffs needed to submit a formal "claim form" and advising Dr. Dupray that the current Policy would expire on May 4, 2019.  Risk Management Group further advised Plaintiffs that once "all information is received," Risk Management Group would "submit [it] for review to [Risk Management Group's] "Captive Manager."

97.    Upon information and belief, the "Captive Manager" was Mary Claire Goff ("**Ms. Goff**") of the Taft Companies. Upon information and belief, Ms. Goff did not have any formal credentials in insurance claims handling, and had no background in patent law, patent litigation, or in claims evaluation, and accordingly could not properly determine whether TracBeam's Loss

---

[9] As described in ¶¶ 10-13 and 18-19, above.

of Key Supplier claim was covered.  Ms. Goff's published resume describes her expertise as negotiating "fronting" arrangements, stop loss and/or reinsurance terms and conditions, but makes no reference to any claim adjustment experience nor does it reference any claims handling credentials.

98.     Upon information and belief, Defendants delegated the responsibility for adjusting TracBeam's "Loss of Key Supplier" claim to Risk Management Group, Paul Francisco, the Taft Companies, and Mary Claire Goff, such that their actions were the actions of Defendants.

99.     Subsequently, on April 18, 2019, Plaintiffs submitted a formal claim (with supporting documentation) directed to "Loss of Key Supplier" coverage under the Policy.  The formal claim was submitted on Risk Management Group's official Claim Form and asserted losses (amount to be determined) arising from the "Loss of Key Supplier" coverage in the Policy; the Key Supplier identified as D&L.

100.    On April 23, 2019, Ms. Shue of Risk Management Group emailed Plaintiffs a response to their formal claim. This email sought information about whether Plaintiffs had any other commercial policies which might cover such a loss. Ms. Shue's inquiry also asked for "comparative Financials to show net loss" and "when available, copies of invoices and the payments for expenses incurred."

101.    On April 30, 2019, Dr. Dupray responded to Ms. Shue, providing answers to her questions. Dr. Dupray also provided financial records for TracBeam, along with written documentation regarding the loss of TracBeam's Key Supplier, D&L, as well as the most recent D&L Contingency Fee contract.

102.     When they renewed Plaintiffs' policy in 2019, Defendants *removed* Loss of Key Supplier coverage as an option for which Plaintiffs could seek coverage.

103.     Oxford's next communication (following Plaintiffs' April 30, 2019 submissions) came three months later, after Dr. Dupray wrote to Ms. Shue on July 31, 2019 and asked her, "What's happening with the claim that I filed?"

104.     Oxford's response came on August 5, 2019 when Adara Sneeringer who identified herself as a "Claims Specialist" for Risk Management Group contacted Dr. Dupray. Ms. Sneeringer advised that she would be taking over the processing of TracBeam's claim and added that "it is currently with our legal team for review." She then promised that "I will be in touch with you by the end of the week to provide you with an update."

105.     Notwithstanding Ms. Sneeringer's promise to be back in touch by "weeks end," Dr. Dupray heard nothing else until he emailed Ms. Sneeringer nearly three months later on November 2, 2019 stating it had "been 7 months without any claims processing" and that such delay would "be considered very unacceptable in most scenarios."

### F.     Defendants Erroneously Deny the Claim.

106.     On November 6, 2019, Ms. Sneeringer (Risk Management Group's Claims Specialist) emailed Dr. Dupray (copying several Risk Management Group personnel, as well as both: Paul Francisco, now identified as Chief Operating Officer and Authorized Representative of Series Protected Cell 1, and Ms. Goff, of the Taft Companies, presumably Risk Management Group's Captive Manager).  The body of this email states:

> Our captive manager has reviewed the Actual Net Loss Policy and supporting documentation submitted to Series Protected Cell 1, A Series of Oxford Insurance Company TN LLC and coverage is denied because it does not fit the definition of Loss of Key Supplier. Attached is a copy of your 18-19 Actual Net Loss Policy and denial letter . . . .
>
> Oxford reserves all of its rights in this matter, and neither this letter nor any prior or future communication should be deemed or construed as a waiver of such rights or as estopping Oxford from asserting such rights.

The email also included an attachment which was a formal letter of claim denial

("**Initial Denial Letter**").

107.   It is noteworthy that the Initial Denial Letter:

(a)   states that "the Taft Companies" had reviewed TracBeam's "Loss of Key Supplier" claim, but the "Taft Companies" were (i) not the insuring entity listed on the Policy, (ii) not legal counsel for Series Protective Cell 1, and (iii) upon information and belief, did not have the expertise in patent law, patent litigation, or in claims evaluation to deny TracBeam's claim; and

(b)   includes no explanation nor justification as to why the Captive Manager (Ms. Goff) who was not a party to TracBeam's insurance policy (and lacked expertise in patent law, patent litigation, or in claims evaluation) was making the call regarding Dr. Dupray\TracBeam's insurance claim.

108.   The Nov. 6th email's attached Initial Denial Letter is addressed to Dr. Dupray and was signed by Mr. Francisco (representing Series Protected Cell 1, the insuring entity on the Policy) although this letter is on Risk Management Group stationery.  The Initial Denial Letter states that the "Taft Companies" (i.e., presumably the Captive Manager, Ms. Goff) had reviewed TracBeam's claim and the Policy, and stated the following:

> [I]t has been determined that coverage does not apply to this claim
> because it does not fit the definition of Loss of Key Supplier . . .
> The definition of Loss of Key Supplier . . . means: . . .
>> b. the termination of cancellation of any contract between
>> Insured and a Key Supplier as a result of: . . .
>>> v. the *adoption or promulgation of federal, state or
>>> local laws, regulations or ordinances, by any
>>> legislative body, executive authority or agency,
>>> affecting such Key Supplier's business and resulting
>>> in increased costs or operating expenses, reduction
>>> in the Key Supplier's business* production capacity,
>>> or the Key Supplier's withdrawal of a product or
>>> service from the market.
> During our extensive review process, it was determined that none of
> the above triggering events [for Loss of Key Supplier] apply. The
> termination letter from Dovel & Luner *does not cite any changes in
> laws/regulations* — rather, it cites recent court cases that interpret
> existing law/regulation in such a way that makes their patent
> prosecutions impracticable. Therefore, it does not fit the definition
> of Loss of Key Supplier.

(Emphasis added).

109.    The phrase "any legislative body, executive authority or agency" in the definition

of Loss of Key Supplier (quoted in the Initial Denial Letter) is not defined.  Most notably, this

phrase is not defined in the Policy, the Risk Review, nor in any other document communicated to

Plaintiffs.

110.    The Initial Denial Letter mistakenly stated that "[t]he termination letter from

D&L does not cite any changes in law/regulations—rather it cites recent court cases that interpret

existing law/regulation in such a way to make patent prosecutions impracticable."  Specifically,

D&L's letter cites their termination is the result of increased costs due to IPR procedures that are

part of the AIA (America Invents Act ) enacted by the U.S. Congress and which went into effect

Mar. 16, 2013.[10]

111.    Further, in their Initial Denial Letter, Defendants assert that no coverage existed

for the Loss of Key Supplier because such a loss "does not fit the definition of Loss of Key

Supplier." This conclusion is erroneous because (a) D&L's termination correspondence to

TracBeam identified the costs and risks resulting from the IPR filings at the USPTO as a basis

for terminating the contract, and (b) Congress created the IPR process when it enacted the AIA.

Congress is a "legislative body" for purposes of the Loss of Key Supplier definition.

112.    Defendants' rejection of the *TC Heartland Supreme Court* decision as a basis for

coverage is also erroneous.  Specifically, in the "Rules Enabling Act of 1934" (28 U.S C. §2071-

2077), Congress delegated part of its legislative power to the United States Supreme Court for

purposes of promulgating rules of court (including venue requirements) and, under that Act, such

rules have the force and effect of law.  Accordingly, *TC Heartland* did change federal law

regarding venue in Federal Courts, and thus, Plaintiff's Loss of Key Supplier claim is a result of

the adoption or promulgation of a federal law by a legislative body.

113.    There is no event, other than the loss of the services of D&L, that could be

covered under the Policy's Loss of Key Supplier provision.

114.    Plaintiffs did not, at any time, request, describe or suggest any event be covered

under Loss of Key Supplier except the loss of D&L's legal services.

---

[10] However, the consequences thereof, e.g., in terms of additional patent litigation risk and
expense took years for patent litigation parties and their legal counsel to assess.

115.     The loss of D&L's legal services was *the only risk* ever identified by Plaintiffs to Defendants (or Oxford Research Group, LLC on behalf of Defendants) for coverage under the Policy's Loss of Key Supplier provisions and for which Defendants had a risk evaluation commissioned.

116.     The loss of D&L's legal services was the precise risk for which Plaintiffs sought coverage for Loss of Key Supplier and for which Defendants charged premiums.

117.     Plaintiffs did *not* provide the actuarial entity, By The Numbers, with *any* information regarding, e.g., Loss of Key Supplier.

118.     The Actuarial Study states:

- "The estimates contained in this report are *based on data provided by Oxford Research Group, LLC* (ORG)." (Emphasis added).

- "All loss and policy information is *based on information provided by ORG* through 1/9/15."[11] (Emphasis added).

**G.     *Plaintiffs Seek to Correct Defendants' Mistaken Claim Denial.***

119.     On December 2, 2019, Plaintiffs, through counsel, wrote an appeal letter to the Chief Operating Officer of Risk Management Group, Paul Francisco (who is also is a representative of Series Protected Cell 1, and who signed the Initial Denial Letter).

---

[11] Additionally, By The Numbers presumably found such loss of legal services "reasonable" for coverage since it went ahead and produced the Actuarial Study which therein states: "BYNAC [By The Numbers] has *reviewed the information provided by ORG for reasonableness and used it without audit*. BYNAC has relied upon the accuracy of the information provided by ORG [*Oxford Research Group, LLC*]."

120.    The purpose of Dr. Dupray's letter was to seek clarification of the Captive

Manager's decision—on behalf of Defendants—to deny TracBeam's claim.

121.    Dr. Dupray explained that one of the reasons that TracBeam had lost its key

supplier, D&L, was because of increasing costs and the increased risk of defending against IPRs.

122.    Plaintiffs also then clarified that Congress created the IPR process in the AIA and

that the AIA was passed by Congress.

123.    Additionally, the appeal letter informed Defendants that the USPTO was (and

continues to be) responsible for overseeing the IPR process and promulgating regulations

governing that process.

124.    Consequently, the events recited in Plaintiffs' claim triggered coverage for Loss

of Key Supplier pursuant to the Policy language.

## H.    *Defendants Unreasonably Deny the Claim.*

125.    After additional months of delay by Defendants, on March 26, 2020, Defendants

sent a reply letter ("**Oxford Reply Letter**") on Risk Management Group letterhead with the

name, "Series Protected Cell 1, A Series of Oxford Insurance Company, TN LLC" typed at the

top. The Oxford Reply Letter was also signed by Paul Francisco as Chief Operating Officer of

Risk Management Group (and apparently of Series Protected Cell 1, as well), and is a response

to TracBeam's appeal.

126.    The Oxford Reply Letter again quoted the "Loss of Key Supplier" language in the

Policy and then focused again on a statement made by D&L that D&L had "difficulty in bringing

suit . . . following . . .  the [United States Supreme Court's] TC Heartland decision" (i.e., *TC*

*Heartland LLC v. Kraft Foods Group Brands, LLC*, 581 U.S. ___, 137 S. Ct. 1514, 197 L. Ed 816, U.S.P.Q.2d 1553 (2017).

127.    The Oxford Reply Letter further included an extended recitation about the history of *TC Heartland* and a discussion about how the *TC Heartland* decision had adversely impacted a number of other [patent] cases.

128.    The Oxford Reply Letter then opined that "federal court decisions are not a 'promulgation of federal law' [which is] a [triggering] condition of the Policy."

129.    Mr. Francisco further reiterated that "federal court decisions cannot constitute a promulgation of federal law."  However, notably, neither the Defendants nor Mr. Francisco cited any authority for the pronouncement that federal court decisions cannot constitute a promulgation of federal law.

130.    In particular, Defendants did not address the "Rules Enabling Act of 1934" (28 U.S C. §2071-2077), in which Congress delegated part of its legislative power to the United States Supreme Court for purposes of promulgating rules of court (including venue requirements).

131.    Court rules passed pursuant to the Rules Enabling Act have the force and effect of law.

132.    Accordingly, Plaintiff's Loss of Key Supplier claim is a *result* of the adoption or promulgation of a federal law by a legislative body.

133.    The Oxford Reply Letter mentioned nothing about the IPR process.

134.    Defendants' denial of the claim disregarded the fact that D&L specifically identified the IPR process—created by Congress and implemented by the USPTO—as a basis for

their withdrawal from the market, despite having had their attention drawn to that fact in this December 2, 2019 letter from Plaintiffs.

135.    The Policy's "Loss of Key Supplier" coverage lacks an anti-concurrent causation clause.

136.    Accordingly, if *either* of D&L's stated termination reasons: (a) "the costs and risks associated with likely IPR filings at the PTAB [Patent Trial and Appeal Board at the USPTO]" resulting from the implementation of the AIA, or (b) "the strict requirements of the *TC Heartland* decision issued by the Supreme Court in May 2017," constitutes an event triggering the Policy's Loss of Key Supplier coverage, then TracBeam's claim is covered.

137.    Consequently, because TracBeam lost the services of D&L as a result of its termination of its agreement to supply legal services due to a covered cause of loss, Defendants were obligated to pay the loss.

## I.    *Defendants' Unreasonable Claim Handling.*

138.    Defendants lacked a reasonable basis for denying TracBeam's claim, especially given Defendants' decision to collect premiums and write Loss of Key Supplier coverage knowing that:

(a) Risk International (Defendants' own risk analysis expert) described—at length—the specific coverages Plaintiffs sought and TracBeam's risk exposures in the Risk Review—including the factors identified in ¶ 44-51, 55-56, 91, above; and

(b) Plaintiffs identified a *single* Key Supplier, D&L, in connection with their application for Loss of Key Supplier coverage, *cf.*, ¶ 51, above.

139.     Consequently, Defendants' failure to fully analyze Plaintiffs' claim in view of the Policy coverages and appreciate Plaintiffs' evidence of claim coverage in the Policy was unreasonable.

140.     At no time did Defendants contact D&L in their investigation of Plaintiffs' Loss of Key Supplier claim.

141.     Accordingly, Defendants did not exercise reasonable diligence in investigating Plaintiffs' claim, and in particular, in fully appreciating D&L's reasons for termination of legal services to Plaintiffs.

142.     Defendants outsourced the responsibility for adjusting TracBeam's claim to other parties and endorsed and ratified the claim-handling decisions of those parties.  Accordingly, all such acts performed by other parties described above are the acts of Defendants.

## J.     *Plaintiffs Have Acted in Good Faith.*

143.     Other than Defendants' specific requests described above, which Plaintiff fully complied with, Defendants never made any further requests for information before denying Plaintiffs' claim in their Initial Denial Letter and before or after their final denial in the Oxford Reply Letter.

## COUNT ONE
## BREACH OF CONTRACT

144.     Plaintiffs hereby incorporate and re-allege paragraphs 1-143 of this complaint as if restated in full herein.

145.     Plaintiffs assert that they have fully and adequately performed all of their requirements under the Policy, including payment in full of all of the premiums which were

agreed upon by the parties hereto.  Moreover, Plaintiffs assert that they have provided adequate documentation of the ANLI Policy Loss of Key Supplier claim, as specifically described above.

146.     The Defendants breached the terms and provisions of the Policy by failing to pay Plaintiffs for the Loss of Key Supplier claim.

147.     As a direct and proximate result of the foregoing breach of contract, Plaintiffs have been damaged in an amount not less than $1,000,000.00 plus interest, costs, and expenses.

<u>**COUNT TWO**</u>
<u>**UNREASONABLE DELAY AND DENIAL OF PAYMENT OF**</u>
<u>**COVERED BENEFITS IN VIOLATION OF §§ 10-3-1115 AND -1116**</u>

148.     Plaintiffs incorporate and re-allege paragraphs 1-143 of this Complaint as if restated in full herein.

149.     Defendants publicly represent the Oxford Insurance Program as being "Best in Class" and falsely represent that the Oxford Insurance Program will properly and promptly address legitimate claims in regard to the coverages issued under their Actual Net Loss Policies (ANLI).  These representations should have resulted in Defendants providing Plaintiffs with greater expertise regarding the claims process.  Instead, Plaintiffs' claim was handled in a sluggish and unprofessional manner by an "executive assistant," and a "Claims Specialist."

150.     Moreover, Plaintiffs' claim was reviewed and improperly denied; such review and denial performed by neither a credentialed claims adjuster, nor a "claims administrator," but instead by a "Captive Manager" (presumably, Ms. Goff) having neither formal legal training, nor the expertise to conduct a reasonable investigation into TracBeam's Loss of Key Supplier claim, e.g., as related to patent law, patent litigation and the changing risks and costs thereof.

151.    When Defendants explained the basis for their denial of the claim in relation to the facts and applicable law, it became apparent that they had no reasonable basis to deny Plaintiffs' claim.

152.    The claims handling of the Defendants demonstrated ignorance or disregard of pertinent federal law (upon which they improperly based their denial).

153.    Defendants unreasonably disregarded the information in Plaintiffs' appeal letter that explained that an act of Congress created the IPR process.

154.    Defendants unreasonably disregarded the information in Plaintiffs' appeal letter that explained that D&L terminated its relationship with Plaintiffs because of the increased financial burden it faced as a result of the IPR process.

155.    Defendants unreasonably disregarded the fact that Congress delegated a portion of its rulemaking authority to the Supreme Court in the "Rules Enabling Act of 1934."

156.    Defendants unreasonably disregarded the information in D&L's termination letter that explained that D&L terminated its relationship with Plaintiffs because of the increased risks it faced as a result of the Supreme Court's decision in *TC Heartland*.

157.    Consequently, Plaintiffs are entitled to recover statutory damages in an amount equal to two times the maximum covered benefit of the Policy's Loss of Key Suppler provision, plus reasonable attorney's fees and costs pursuant to § 10-3-1116, Colo. Rev. Stat.

## **PRAYER FOR DAMAGES**

WHEREFORE, Plaintiffs, Dr. Dennis J. Dupray and TracBeam, LLC, pray that this Court enter judgment in their favor and against Defendants Oxford Insurance Company TN, LLC, and Series Protected Cell 1, a series of Oxford Insurance Company TN, LLC as follows:

A.      Award Plaintiffs damages in the full amount of their claim (i.e., $1,000,000.00);

B.      Award Plaintiffs statutory damages in an amount equal to two times the maximum covered benefit;

C.      Award Plaintiffs their reasonable attorneys' fees under § 10-3-1116 and/or § 10-3-1005; and

D.      Award Plaintiffs their allowable Court Costs.

**Plaintiffs request a jury trial on all issues.**

Respectfully submitted this 8th day of March, 2022.

OGBORN MIHM, LLP

By: */s/Thomas D. Neville*_____
Thomas Neville (Colo Bar #35011)
1700 Lincoln Street, Suite 2700
Denver Colorado 80203
Tele: (303) 592-5900
Fax: (303) 592-5910
E-mail: Thomas.Neville@OMTrial.com

and

John Michael Johnston
Suite 620 Robert S. Kerr Ave.
Oklahoma City, Oklahoma 73102
Tele: (405) 235-4074
E-mail:   Johnstonlaw@coxinet.net
*Attorneys for Plaintiffs, Dennis J. Dupray and TracBeam, LLC*